UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ADRIAN MARTINEZ,

Plaintiff,

v. CASE NO. 4:23-cv-00580-Y

BNSF RAILWAY COMPANY,

Defendant.

**BNSF RAILWAY COMPANY'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

BNSF Railway Company ("BNSF") submits this brief in support of its motion for summary judgment on all of Adrian Martinez's claims against BNSF.

# TABLE OF CONTENTS


I. SUMMARY ..... 1

II. LIVE PLEADINGS ..... 1

III. INTRODUCTION ..... 2

IV. BACKGROUND ..... 3

A. Martinez's Employment and BNSF's Reporting and Other Rules. ..... 3

B. Beginning in Early 2021, Martinez Experiences, But Fails to Report, an Injury to his Left Knee That Affected His Ability to Work Safely. ..... 3

C. Martinez Comes to Work on June 18 and Further Injures His Left Knee, But Does Not Tell BNSF the Full Story About What He Had Been Experiencing Before That Date. ..... 5

D. Martinez Fills Out an Injury Report on June 21 but Still Does Not Tell BNSF About What Had Happened With His Knee Before June 18. ..... 6

E. Martinez Discusses the June 18 Incident With BNSF's Medical Department But Does Not Reveal What Happened With His Knee Before June 18. ..... 7

F. BNSF Learns of Martinez's Misconduct By Reviewing His Medical Records. ..... 7

G. BNSF's Disciplinary Process. ..... 8

H. BNSF Investigates Martinez's Misconduct. ..... 9

I. After the Investigation, Two Disinterested Employees Recommend Dismissal, and General Manager Janssen Thompson Decides to Dismiss Martinez Due to His Misconduct. ..... 10

J. Martinez's Union Submits an Unsuccessful Grievance ..... 11

K. Martinez Files an Unsuccessful OSHA Complaint. ..... 11

L. Martinez Files a Charge of Discrimination With the EEOC. ..... 12

M. Martinez Sues BNSF. ..... 12

V. SUMMARY JUDGMENT STANDARD ..... 13

VI. ARGUMENT AND AUTHORITIES ..... 14

A. Summary Judgment is Appropriate on Martinez's FRSA Claim. ..... 14

1. Applicable Standards. ..... 14

2. Martinez cannot establish a fact issue as to causation. ..... 15

3. Martinez's argument that he complied with GCOR 1.2.5 as it was written is not evidence of causation. ..... 23

4. Martinez's argument that he complied with GCOR 1.2.5 as he interpreted it, and arguments about the rule's fairness, are not evidence of causation. ..... 25

5. Martinez's arguments that he should have been trained on the reporting rule or that it contains ambiguities are not evidence of causation. ....27

6. The fact that Martinez eventually signed a medical release does not excuse his misconduct. ....28

7. BNSF's decision to charge Martinez with a more serious rule violation than a less serious one does not establish causation. ....29

8. The fact that BNSF learned about Martinez's misconduct in connection with his injury report is not evidence of causation. ....29

9. BNSF's determination that the incident on the 18th was not reportable to the FRA is not evidence of causation. ....32

10. BNSF has established its affirmative defense. ....33

B. Summary Judgment is Appropriate on Martinez's ADA Claim ....36

1. Applicable Standards ....36

2. BNSF's inquiries were permitted by the ADA. ....38

VII. CONCLUSION ....42

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............ 13

*Bhd. of Ry., Airline, & S. S. Clerks, Freight Handlers, Express & Station Emp. v. St. Louis Sw. Ry. Co.*,
676 F.2d 132 (5th Cir. 1982) ............ 11

*Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment, Cent. Conference v. Union Pacific R. Co.*,
719 F.3d 801 (7th Cir. 2013) ............ 37

*Brousil v. United States Dep't of Lab., Admin. Rev. Bd.*,
43 F.4th 808 (7th Cir. 2022) ............ 36

*Brownfield v. City of Yakima*,
612 F.3d 1140 (9th Cir. 2010) ............ 40

*Bryant v. Compass Group USA, Inc.*,
413 F.3d 471 (5th Cir. 2005) ............ 20

*Burton v. Freescale Semiconductor, Inc.*,
798 F.3d 222 (5th Cir. 2015) ............ 25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............ 13

*Cervantez v. KMGP Servs. Co. Inc.*,
349 F. App'x 4 (5th Cir. 2009) ............ 25

*Coffey v. Norfolk S. Ry. Co.*,
23 F.4th 332 (4th Cir. 2022) ............ 40

*Conroy v. New York Dept. of Correctional Servs.*,
333 F.3d 88 (2d Cir. 2003)............ 37, 41

*Cushman v. Union Pac. R.R. Co.*,
No. 8:23-CV-196, 2024 WL 1094703 (D. Neb. Mar. 12, 2024) ............ 15

*Dakota, Minnesota & E. R.R. Corp. v. U.S. Dep't of Lab. Admin. Rev. Bd.*,
948 F.3d 940 (8th Cir. 2020) ............ 31

*De Anda v. St. Joseph's Hosp.*,
671 F.2d 850 (5th Cir. 1982) ............ 20

*Deines v. Texas Dep't of Protective & Regul. Servs.*,
164 F.3d 277 (5th Cir. 1999) ........ 20, 25, 27, 28

*Diggs v. Burlington N. & Santa Fe Ry. Co.*,
742 F. App'x 1 (5th Cir. 2018) ........ 37

*Dismuke v. City of Indianola*,
32 Fed. Appx. 126 (5th Cir. Feb. 11, 2002) ........ 20

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*,
100 F.4th 1251 (10th Cir. 2024) ........ 15

*Dubaz v. Johnson Controls World Servs., Inc.*,
163 F.3d 1357 (5th Cir. 1998) ........ 25

*Epple v. BNSF Ry. Co.*,
785 F. Appx 219 (5th Cir. 2019) ........ 35

*Fuzy v. S&B Engineers & Constructors, Ltd.*,
332 F.3d 301 (5th Cir. 2003) ........ 37

*Hinojosa v. Jostens Inc.*,
128 F. App'x 364 (5th Cir. 2005) ........ 37

*In re Jones*,
446 B.R. 466 (Bankr. D. Kan. 2011) ........ 7, 41

*Jackson v. Cal-W. Packaging Corp.*,
602 F.3d 374 (5th Cir. 2010) ........ 23

*Jackson v. Watkins*,
619 F.3d 463 (5th Cir. 2010) ........ 25

*Kirkish v. Mesa Imports, Inc.*,
No. CV-08-1965-PHX-NVW, 2010 WL 364183 (D. Ariz. Feb. 1, 2010) ........ 24, 40

*Koziara v. BNSF Ry. Co.*,
840 F.3d 873 (7th Cir. 2016) ........ 31

*Kuduk v. BNSF Ry. Co.*,
768 F.3d 786 (8th Cir. 2014) ........ 36

*Leonard v. Electro-Mech. Corp.*,
36 F. Supp. 3d 679 (W.D. Va. 2014) ........ 40

*Little v. Liquid Air Corp.*,
37 F.3d 1069 (5th Cir. 1994) ........ 13

*Little v. Republic Ref. Co.*,
924 F.2d 93 (5th Cir. 1991) .......... 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .......... 13

*Matta v. Kansas City S. Ry. Co.*,
No. 5:20-CV-48, 2022 WL 1467461 (S.D. Tex. Mar. 30, 2022) .......... 14, 15

*Mayberry v. Vought Aircraft Co.*,
55 F.3d 1086 (5th Cir. 1995) .......... 20

*McKennon v. Nashville Banner Pub. Co.*,
513 U.S. 352, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995) .......... 31

*Mills v. Johnson*,
No. 4:13-CV-352-A, 2014 WL 1224748 (N.D. Tex. Mar. 24, 2014) .......... 41

*Moore v. Eli Lilly & Co.*,
990 F.2d 812 (5th Cir. 1993) .......... 20

*Moyer v. Jos. A. Bank Clothiers, Inc.*,
No. 3:11-CV-3076-L, 2013 WL 4434901 (N.D. Tex. Aug. 19, 2013) .......... 25

*Murray v. UBS Securities, LLC*,
No. 22-660, 2024 WL 478566 (U.S. Feb. 8, 2024) .......... 14, 15, 20, 27, 33, 34

*Painter v. Ill. Dep't of Transp.*,
715 F. App'x 538 (7th Cir. 2017) .......... 37

*Parker v. Pulte Homes of Texas, L.P.*,
No. CIV.A. H-09-2743, 2011 WL 767182 (S.D. Tex. Feb. 25, 2011) .......... 41

*Plumlee v. City of Kennedale*,
795 F. Supp. 2d 556 (N.D. Tex. 2011) .......... 31

*Reeves v. Sanderson Plumbing Prod., Inc.*,
530 U.S. 133 (2000) .......... 21

*See v. Illinois Gaming Bd.*,
29 F.4th 363 (7th Cir. 2022) .......... 40

*Skinner v. Railway Labor Executives' Ass'n*,
489 U.S. 602 (1989) .......... 37, 38

*Thomas v. Corwin*,
483 F.3d 516 (8th Cir. 2007) .......... 37

*Turco v. Hoechst Celanese Corp.*,
101 F.3d 1090 (5th Cir. 1996) .................... 24

*Turner v. Texas Instruments, Inc.*,
555 F.2d 1251 (1977).................... 20

*U.S. v. E.E.O.C. v. AIC Investigations, Ltd.*,
55 F.3d 1276 (7th Cir. 1995) .................... 37

*Waggoner v. City of Garland, Tex.*,
987 F.2d 1160 (5th Cir. 1993) .................... 20

*Yowell v. Admin Rev. Bd.*,
993 F.3d 418 (5th Cir. 2021) .................... 14, 15, 30, 31

**Statutes**

42 U.S.C. § 12112(d)(4)(A) .................... 37, 40

42 U.S.C. § 12112(d)(4)(B) .................... 36, 37, 39, 40

45 U.S.C. § 51 .................... 7

45 U.S.C. § 153 .................... 9, 11

49 U.S.C. § 20109 .................... 14

49 U.S.C. § 20109(d) .................... 11

49 U.S.C. § 20109(d)(3) .................... 12

49 U.S.C. § 20901 .................... 32

49 U.S.C. § 42121 .................... 14

49 U.S.C. § 42121(b) .................... 14

49 U.S.C. § 42121(b)(2)(B)(ii) .................... 15

49 U.S.C. § 21103 .................... 38

49 U.S.C. § 21101(5) .................... 38

**Rules**

FED. R. CIV. P. 1 .................... 13

FED. R. CIV. P. 56(a) .................... 13

**Regulations**

49 C.F.R. § 225.1 .......... 32

49 C.F.R. § 209.301 .......... 38

49 C.F.R. § 209.303(a) .......... 38

## I. SUMMARY

As required by Local Rule 56.3(a), BNSF states that it seeks summary judgment as to the following elements of Martinez's claims and its defenses:

Martinez's FRSA discrimination claim fails because he cannot show that BNSF fired him because he engaged in protected activity under the statute. In addition, BNSF is entitled to summary judgment because it proved its affirmative defense that it would have fired him even absent protected activity.

Martinez's ADA claim fails because the inquiries he complains about were permitted by the ADA.

## II. LIVE PLEADINGS

***Plaintiff's Live Pleading*:** Complaint, Docket No. 1, Filed June 8, 2023.

***Defendant's Live Pleading*:** Answer, Docket No. 6, Filed June 30, 2023.

## III. INTRODUCTION

BNSF fired Martinez after it learned that, in violation of its rules, he failed to disclose a knee injury he had been experiencing for months which made it unsafe for him to work as a conductor, including multiple instances where he could not put weight on his left knee and where he experienced intermittent buckling of that knee. Martinez alleges that the firing violated the Federal Railroad Safety Act ("FRSA"), which prohibits railroad employers from disciplining employees for reporting injuries. He also alleges that BNSF's requirement that he disclose what he was experiencing with his knee violated the Americans with Disabilities Act ("ADA").

Regarding the former, Martinez does not contend that BNSF is lying about its nondiscriminatory reason for firing him (*i.e.*, that he was dishonest and engaged in misrepresentation when he violated BNSF's reporting rules), but instead contends that if BNSF had investigated further, it would have come to a different conclusion. But, because employers need only make nondiscriminatory decisions (as opposed to "correct" decisions), this claim is dead on arrival. In any event, even if Martinez were to change course and now contend that BNSF is lying and that its true reason for firing him was because he reported an injury, he does not have a single piece of evidence to support that speculation, much less the substantial evidence required to create a triable jury issue. And, in any event, BNSF has satisfied an affirmative defense it has under the FRSA by showing that it would have fired Martinez for his misconduct even absent protected activity.

His ADA claim fares no better, because the ADA expressly permits employers to ask employees about their ability to perform job-related functions, and to seek medical information when doing so is job-related and consistent with business necessity. Because the inquiries at issue here fall squarely within those permitted categories of inquiries, Martinez's ADA claim fails as a matter of law.

## IV. BACKGROUND

### A. Martinez's Employment and BNSF's Reporting and Other Rules.

In 2021, Martinez worked for BNSF as a conductor. App. 30-31. At its most basic level, conductors are responsible for safely getting a train from one location to another. App. 37-40. Among other things, the job requires "carrying quite a bit of weight," as well as significant walking on uneven surfaces and frequent kneeling. App. 54, 94-99, 100-01, 102. Martinez agrees that working as a conductor can be a dangerous job, and that he and BNSF shared the goal of ensuring that he and his coworkers worked safely. App. 37-40.

As a conductor, Martinez was subject to a set of BNSF rules known as the General Code of Operating Rules, or GCOR. App. 40. One of those rules, GCOR 1.2.5, required that Martinez report all on-duty injuries, as well as any off-duty injury that "will in any way affect employee performance of duties." App. 103, 136. Martinez acknowledges that this rule can help BNSF identify employees who might not be able to safely perform their job duties. App. 62-63. Another rule, GCOR 1.2.7, says that employees "must not withhold information, or fail to give all the facts to those authorized to receive information regarding . . . accidents[ or] personal injuries. . . ." App. 107, 137. A final relevant rule, GCOR 1.6, says that employees must not be dishonest. App. 110, 138. These rules are important, because they allow BNSF to ensure that its employees work safely, and because they allow BNSF to comply with its obligation to report certain workplace injuries to the Federal Railroad Administration ("FRA"). App. 367-69; 392, 393-94; 63. This case involves Martinez's failure to comply with these rules.

### B. Beginning in Early 2021, Martinez Experiences, But Fails to Report, an Injury to his Left Knee That Affected His Ability to Work Safely.

In early 2021, Martinez stepped in a pothole while working and his left "knee buckled under [him]," which caused him to "kind of buckle[] forward." App. 48-50. A note from

Martinez's doctor described this incident as Martinez "twist[ing] his [left] knee," and says that "following this episode [Martinez] was unable to bear weight but this subsided over time." App. 41, 129-132. Martinez agrees that if an employee twists their knee at work and thereafter cannot put weight on it, BNSF's rules require the employee to immediately report that incident to BNSF. App. 53. But Martinez did do so, and instead finished his shift. *See generally* App. 50, 61-62, 108.

On May 24, Martinez went to his doctor and reported "left knee pain, achy, 6/10." App. 139-42; 43-44. He further reported that "walking and weight bearing make it worse." App. 139-42. Notes from that visit reflect a "notable limp left side while walking, laxity and some catching of left knee joint." App. 140. The doctor prescribed an anti-inflammatory drug called Mobic, and referred Martinez to an orthopedist. App. 140; 42, 59; 160-61. Martinez did not report this visit or any of these issues to BNSF. *See generally* App. 59, 61-62, 108.

On June 2, Martinez was moving a box in his garage and, according to a note from his doctor, his knee again "locked up" and he had "difficulty bearing weight" for a second time. App. 177-80; 56-59, 129-32. Although Martinez agrees that "having your leg lock up is something that can affect a person's ability to do their job as a conductor at BNSF," he did not report this incident to BNSF. App. 61-62, 108.

The next day, Martinez underwent a physical evaluation by his doctor. App. 177-80. The notes from that evaluation reflect additional instances in which his knee was "really stiff" and possibly "hyper extended," as well as a recent time when he "tried to get out of bed and couldn't." App. 177-80. Moreover, the notes reflect that Martinez experienced pain in his left knee when he engaged in "walking, bending, [and] twisting," and that his "left knee pain [] limit[ed] him from activities and participation including walking, weight bearing, twisting, bending, . . . [and] working. . . ." App. 177-80. The notes further reflect that Martinez had been using heat and ice to

address the issues he was having with his knee, and his wife acknowledged seeing him do that once or twice a week in June 2021 and the period leading up to that month. App. 177-80; 184. The notes further reflect Martinez's "functional activity" of "working" as having a "moderate limitation." App. 177. But Martinez did not report any of this to BNSF. *See generally* App. 61-62, 108.

On June 10, Martinez went to the orthopedist that his doctor had referred him to. App. 129-32. The orthopedist's notes reflect that Martinez had been experiencing "intermittent mechanical symptoms of buckling" since the initial pothole incident months earlier. App. 129-32. The orthopedist assessed Martinez as having a "[t]ear of medial meniscus of left knee," and scheduled Martinez for an MRI on June 21 so that "further recommendations" could be made. App. 129-32; *see also* App. 60 ("He said there were all sorts of things that it could be, that it might be a small tear in the meniscus"). Although Martinez agrees that occasions where a leg intermittently buckles is something that could affect a person's ability to do their job as a conductor at BNSF, App. 61, he did not report that symptom to BNSF. *See generally* App. 61-62. Nor did he report his visit with the orthopedist, the assessment of a meniscus tear, or the MRI that had been scheduled for June 21. *See generally* App. 61-62, 64, 108.

### C. Martinez Comes to Work on June 18 and Further Injures His Left Knee, But Does Not Tell BNSF the Full Story About What He Had Been Experiencing Before That Date.

On June 18, three days before his MRI was scheduled to take place, Martinez says that he felt and heard a pop in his left knee while he was working.[1] App. 65-70. According to Martinez, the pop occurred while he was stepping up into a train, and did not initially cause any pain. App.

[1] For purposes of this Motion, BNSF assumes as it must that Martinez's description of what happened on June 18 is accurate.

68-69. He further claims that he soon realized that he "couldn't put any weight" on his left knee, so he notified a supervisor, the Road Foreman of Engines Cory Harmond. App. 68-71; 190, 191-95.

Supervisor Harmond was concerned for Martinez's wellbeing and did not try talk Martinez out of reporting or disclosing the injury. App. 74-75. Nor did Harmond say anything negative to Martinez about the fact that Martinez was reporting an injury. App. 74-75. To the contrary, Harmond asked Martinez if he needed medical treatment or transportation to a medical facility, which Martinez declined in favor of simply going home. App. 72-73; 190, 191-95.

Importantly, despite that exchange with Harmond, Martinez did not tell Harmond or anyone else at BNSF that he had already been seeing doctors for very similar symptoms with his left knee (*i.e.*, locking and periods where he could not put weight on it) or that he had an MRI already scheduled for a few days later. *See generally* App. 76.

**D. Martinez Fills Out an Injury Report on June 21 but Still Does Not Tell BNSF About What Had Happened With His Knee Before June 18.**

On June 21, Martinez underwent the previously scheduled MRI, which ultimately confirmed his doctor's June 10 assessment of a torn meniscus. App. 64, 76, 77-78. The same day, Martinez filled out a BNSF injury report form and described what he claims happened on the 18th. App. 80-81, 133. Importantly for purposes of this case, however, Martinez failed to disclose that the incident on the 18th was part of an ongoing injury he had been experiencing for months, despite the fact that (1) BNSF's rules require employees to report "all the facts. . . regarding . . . personal injuries," App. 200, and (2) the injury form specifically asked for that information:

**EMPLOYEE PERSONAL INJURY/OCCUPATIONAL ILLNESS REPORT**

Each employee reporting an injury, condition or occupational illness on duty and/or on property must fill out this report and provide it to his or her supervisor (pursuant to § 225.19). A copy will be provided upon request.

| NAME OF INJURED PERSON | AGE | DATE OF BIRTH | SENIORITY DATE | EMPLOYEE ID NUMBER |
|---|---|---|---|---|
| Adrian Martinez | 59 | [redacted] | 04·23·01 | [redacted] |

| ADDRESS OF INJURED PERSON (STREET, CITY, ZIP CODE) | TELEPHONE NUMBER |
|---|---|
| [redacted] | [redacted] |

| LOCATION OF INJURY (CITY AND STATE) | MILE POST (IF APPLICABLE) | SUBDIVISION (IF APPLICABLE) | DATE OF INJURY | TIME |
|---|---|---|---|---|
| Gainesville texas | 413.2X | Red Rock | 6·18·21 | ☐ AM ☒ PM |

| TEMPERATURE | VISIBILITY (Check correct response) | | WEATHER (Check correct response) |
|---|---|---|---|
| 95+ | Clear | ☐ DAWN ☐ DUSK ☒ DAY ☐ DARK | ☒ CLEAR ☐ RAIN ☐ SLEET/ ICE ☐ CLOUDY ☐ FOG ☐ SNOW |

| IF THIS IS AN ILLNESS OR CONDITION RATHER THAN AN ACUTE INJURY, WHEN DID YOU FIRST NOTICE SYMPTOMS? | WHEN WERE YOU FIRST TREATED OR DIAGNOSED? |
|---|---|
| | |

App. 82, 84, 133.

### E. Martinez Discusses the June 18 Incident With BNSF's Medical Department But Does Not Reveal What Happened With His Knee Before June 18.

The same day that he filled out the above-discussed injury report, Martinez also spoke with a medical professional in BNSF's Medical Department, Dana Dickey. App. 82-83. And, although he told her that he had an MRI that day, he did not tell her it had been scheduled before the incident on the 18th. *Id.*; App. 442, 444-46, 449-50. Nor did he tell her that he had (1) been experiencing pain in his left knee for months, (2) multiple prior incidents where he could not put weight on his left knee, (3) been taking prescription medication for his knee, or (4) been experiencing intermittent mechanical buckling. App. 440-43, 444-46, 447, 448, 455-65.

### F. BNSF Learns of Martinez's Misconduct By Reviewing His Medical Records.

"Railroad workers are not covered by state workers' compensation laws."[2] Instead, injured railroad employees can make claims against their railroad employers under the Federal Employers Liability Act.[3] Accordingly, BNSF (like other railroads) has an in-house claims department that

[2] *In re Jones*, 446 B.R. 466, 471 (Bankr. D. Kan. 2011).

[3] 45 U.S.C. § 51.

accepts and processes claims for compensation arising from (among other things) work-related injuries. *See generally* App. 400-01, 402-05, 406.

In connection with its processing of his injury claim and need for medical leave, BNSF requested that Martinez authorize it to obtain relevant medical records. App. 85-86, 87-88; 171-72. Eventually, on July 8, Martinez provided that authorization. App. 210. Those records included the notes from Martinez's visit to the orthopedic doctor that occurred on June 10, and revealed the ongoing issues Martinez had been experiencing (but had not disclosed to BNSF) for months. App. 213-16.

**G. BNSF's Disciplinary Process.**

At BNSF, collective bargaining agreements provide union-represented employees with various substantive and procedural protections concerning discipline, including dismissal. *See generally* App. 222-26; 327-28. Generally, under those agreements, BNSF is required to provide employees with notice of rule violations within a certain amount of time after learning of the violation, and to provide employees with a fair and impartial investigation. *Id*. An "investigation" in this context means a hearing presided over by a company official. *Id*. Employees are given notice of the hearing and attend with a union representative; they may present witnesses, admit exhibits, question BNSF's witnesses, and testify themselves. *Id*.

After the investigation, management determines whether the evidence shows a rules violation and, if so, the appropriate discipline. App. 292-93. BNSF has a "PEPA team," a group within its Labor Relations department that advises on potential dismissals of scheduled employees to help ensure consistent application of BNSF's policies and compliance with applicable collective bargaining agreements. *Id.*; App. 326-28; 234-35.

Through a union, a scheduled employee can appeal discipline decisions, including dismissals, both within BNSF and to a group of arbitrators referred to as a Public Law Board. *See*

*generally* App. 343-44. In those instances, the Board will issue a decision addressing the appeal. *See generally* App. 345-47. The Board can uphold or overturn discipline and dismissal decisions. *See generally id*.[4]

**H. BNSF Investigates Martinez's Misconduct.**

Pursuant to its disciplinary process just described, BNSF conducted an investigation to determine whether it should discipline Martinez for his dishonesty in failing to fully disclose the circumstances leading to his June 18 injury. App. 228-30, 254, 255-59, 260-62, 265-66, 267-71, 272-75; 287-89, 294-97; 331.

Corridor Superintendent Chris Grissum conducted the hearing. App. 220, 221, 222-23. At the hearing, Martinez had union representation. App. 91-93. Martinez and the union representative had the ability to present their own witnesses and exhibits, question BNSF's witnesses, lodge objections, and make statements on his behalf. *Id*.

At the hearing, BNSF asked Martinez about his failure to disclose the matters set out in his orthopedic doctor's June 10 notes, including that he had been experiencing pain in his left knee for months, that he had prior instances of not being able to put weight on his knee, and that he had been experiencing intermittent symptoms of mechanical buckling. App. 313-15, 316-18, 319. In response, Martinez claimed that his doctor's notes were incorrect, that he had not been experiencing the things reflected in those notes, and that instead all he experienced before June 18 was that his "knee was stiff on occasion." App. 313-15.[5]

---

[4] *See also* 45 U.S.C. § 153, Second.

[5] Martinez took a similar approach at his deposition. *See, e.g.*, App. 52-53.

**I. After the Investigation, Two Disinterested Employees Recommend Dismissal, and General Manager Janssen Thompson Decides to Dismiss Martinez Due to His Misconduct.**

Following the investigation, hearing officer Grissum (who had only passing interactions with Martinez prior to the investigation) made a recommendation that Martinez's employment be terminated due to his violation of GCOR 1.2.5 Reporting, GCOR 1.2.7 Furnishing Information, and GCOR 1.6 Conduct. App. 220, 227-33, 234-35, 238-40, 241, 242-47; 307. Specifically, Grissum believed that Martinez was dishonest and violated BNSF's rules by not providing full information about his knee injury before the 18th or when he filled out his injury form. *Id*. at 228-30, 238-39, 241.

In addition, the investigation transcript and exhibits were reviewed by a member of a team within the Labor Relations Department to determine whether the noticed charges had been proven and that Martinez's procedural rights were satisfied. App. 324-26. Labor Relations Director John Murphy (who does not know Martinez) conducted that review, and issued a recommendation supporting the termination of Martinez's employment based on the rule violations established at the investigation. App. 325-26, 329-33, 335, 336-37, 342. Among other things, Murphy believed that Martinez was dishonest when he filled out his injury report form but did not disclose his prior symptoms and treatment. *Id*. at 331, 335.

Those recommendations then went to Janssen Thompson, who at the time was the General Manager of the Red River Division (*i.e.*, the division where Martinez worked at the time). App. 282-83, 292-93, 303, 307. Thompson had no prior knowledge of, or interactions with, Martinez. App. 285-86. Thompson conducted an independent review of the hearing transcript and evidence and concluded that Martinez had been dishonest and violated BNSF's rules by not disclosing his ongoing knee injury, and therefore made the decision to terminate Martinez's employment. App.

290-93, 294-99, 302-03. BNSF notified Martinez of its decision via a letter dated September 14. App. 89-90, 135.

### J. Martinez's Union Submits an Unsuccessful Grievance

Martinez's union then filed a grievance on his behalf. App. 343-44. As Martinez does here, his union attempted to downplay his prior knee injury as simply involving "normal wear and tear of the joint," and contended that Martinez did not know he had a reportable injury before June 18. *Id*. But a Public Law Board[6] disagreed, and concluded that (1) "there was sufficient evidence in the record to support the finding that [Martinez] was guilty of violating GCOR 1.2.5., 1.2.7, and 1.6 when [Martinez] was dishonest and misrepresented when reporting the injury that he stated occurred on June 18, 2021," and (2) "[g]iven the seriousness of the offense of dishonesty and misrepresentation when reporting an injury that took place while [Martinez] was assigned as a conductor, [the PLB] [could not] find that [BNSF] acted unreasonably, arbitrarily, or capriciously when it terminated [Martinez'] employment." App. 345-47.

### K. Martinez Files an Unsuccessful OSHA Complaint.

To initiate a claim under the FRSA, an employee must first file a complaint with the Occupational Safety and Health Administration.[7] Martinez did so on September 29, 2021. App. 431. The complaint reflects that Martinez told OSHA he "injured his knee two months prior to [the June 18] incident, but was only inflammation." *Id*. After investigating Martinez's allegation that BNSF violated the FRSA by firing him, OSHA issued an opinion finding that "in late April, [Martinez] experienced pain and swelling in his left knee and sought medical treatment from his

---

[6] Public Law Boards are arbitration boards authorized by the Railway Labor Act to hear certain disputes between railroads and unions. *See Bhd. of Ry., Airline, & S. S. Clerks, Freight Handlers, Express & Station Emp. v. St. Louis Sw. Ry. Co.*, 676 F.2d 132, 134 (5th Cir. 1982); 45 U.S.C. § 153, Second.

[7] 49 U.S.C. § 20109(d).

primary care physician" but that he "did not report the injury to [BNSF]." App. 432-35. The agency further stated that its "investigation did not establish that [Martinez's] alleged protected activity was a contributing factor in [BNSF's] decision to terminate his employment" and that OSHA therefore "[did] not have reasonable cause to believe a violation of the [FRSA] occurred." *Id*. Accordingly, OSHA dismissed Martinez's complaint. As he was permitted to do by applicable law, Martinez appealed that decision by requesting a hearing before an Administrative Law Judge. App. 436.

**L. Martinez Files a Charge of Discrimination With the EEOC.**

Separately, Martinez filed a charge of discrimination with the EEOC in which he alleged that BNSF violated the Americans With Disabilities Act ("ADA") by "terminat[ing] [him] for not disclosing [his] medical condition." App. 348-50. The EEOC issued a Right to Sue letter without making a determination as to whether Martinez's allegation had merit. App. 466.

**M. Martinez Sues BNSF.**

The FRSA provides that if the Secretary of Labor has not issued a final decision within 210 days of an employee's OSHA complaint, the employee can "kick out" their claim to a United States District Court.[8] After receiving the EEOC Right to Sue Letter, Martinez exercised his kick-out right and filed this lawsuit. Docket No. 1. In it, he reasserted his claim that BNSF violated the ADA by "requir[ing] Martinez to disclose his preexisting condition and then terminat[ing] him for not so doing." *Id*. at 6. He also alleged that BNSF violated the FRSA by purportedly firing him for reporting an injury. *Id*. at 6. For the following reasons, these claims are without merit.

[8] 49 U.S.C. § 20109(d)(3).

## V. SUMMARY JUDGMENT STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules [of Civil Procedure] as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"[9] Indeed, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[10]

A movant is entitled to summary judgment if the record establishes "there is no genuine dispute as to any material fact."[11] "[T]he substantive law will identify which facts are material."[12] Facts are material only if they "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary will not be counted."[13] A material factual dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . ."[14] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[15] To defeat summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."[16]

---

[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting FED. R. CIV. P. 1).

[10] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (emphasis in original; internal quotation omitted).

[11] FED. R. CIV. P. 56(a).

[12] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[13] *Id.*

[14] *Id.*

[15] *Id.* at 249-50 (internal citations omitted).

[16] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## VI. ARGUMENT AND AUTHORITIES

### A. Summary Judgment is Appropriate on Martinez's FRSA Claim.

1. Applicable Standards.

To succeed on his FRSA claim, Martinez must establish, by a preponderance of the evidence, that (1) he engaged in an activity protected by the FRSA, (2) BNSF knew about that protected activity, (3) he experienced an adverse employment action, and (4) the protected activity was a contributing factor to adverse employment action.[17] Regarding the contributing-factor element, the Supreme Court recently decided a case arising under the employee-protection provision of the Sarbanes-Oxley Act.[18] That SOX provision, like the provision of the FRSA at issue in this case, 49 U.S.C. § 20109, adopts for certain purposes the burden-shifting framework from 49 U.S.C. § 42121(b).[19] Pursuant to that burden-shifting framework, an employee must show that their protected activity was a contributing factor (but not a "significant," "motivating," "substantial," or "predominant" factor) in the adverse action.[20]

The Supreme Court clarified that the employee need not show retaliatory animus or a malevolent motive. The Court confirmed, however, that the employee must show the employer engaged in intentional retaliation, that is, that the employer "intentionally treat[ed] [the employee]

---

[17] *Matta v. Kansas City S. Ry. Co.*, No. 5:20-CV-48, 2022 WL 1467461, at *4 (S.D. Tex. Mar. 30, 2022) (citing *Yowell v. Admin Rev. Bd.*, 993 F.3d 418, 421 (5th Cir. 2021)).

[18] *Murray v. UBS Securities, LLC*, No. 22-660, 2024 WL 478566 (U.S. Feb. 8, 2024).

[19] 49 U.S.C. § 42121(b) is a provision in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, which governs certain aspects of the U.S. air carrier industry. *See generally* 49 U.S.C. § 42121.

[20] *Murray*, 2024 WL 478566 at *3.

worse because of a protected characteristic."[21] Thus, Martinez must make such a showing to satisfy the contributing factor causation requirement.

If Martinez can make that showing (and he cannot for the reasons set out below), BNSF is still entitled to judgment in its favor if it establishes the affirmative defense set out in the statutory framework.[22] To do so, BNSF must show by clear and convincing evidence that it would have taken the same adverse action in the absence of the protected activity.[23]

In this case, Martinez alleges that his protected activity was his June 18 injury report, and that the adverse action is his dismissal. App. 3. For purposes of this Motion, BNSF does not dispute that Martinez's June 18 injury report was protected activity, that BNSF knew about that report, or that his dismissal constitutes an adverse action. But BNSF does dispute that Martinez can demonstrate a genuine issue of material fact as to the fourth element of his initial case (*i.e.*, that his injury report was a contributing factor to his dismissal). Alternatively, there is no genuine issue of material fact as to BNSF's affirmative defense.

2. <u>Martinez cannot establish a fact issue as to causation</u>.

In some wrongful termination cases, an employee seeks to prove discrimination by alleging that the employer is lying when it states its nondiscriminatory reason for firing the employee. This is not such a case, because Martinez does not contend that BNSF is lying about the reason for

---

[21] *Murray*, 2024 WL 478566 at *6 (internal quotations and citations omitted); *see also Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1285 (10th Cir. 2024) (Ebel, J., concurring) (describing Murray's holding as "drawing distinction between discriminate, meaning to treat individuals differently, and an animus-like retaliatory intent") (internal quotations omitted); *Cushman v. Union Pac. R.R. Co.*, No. 8:23-CV-196, 2024 WL 1094703, at *7 (D. Neb. Mar. 12, 2024) (discussing *Murray* and concluding "that there is no requirement to plead prejudice, bias, or animus to state a claim for discrimination") (internal quotation omitted).

[22] 49 U.S.C. § 42121(b)(2)(B)(ii).

[23] *Matta v. Kansas City S. Ry. Co.*, No. 5:20-CV-48, 2022 WL 1467461, at *4 (S.D. Tex. Mar. 30, 2022) (citing *Yowell v. Admin Rev. Bd.*, 993 F.3d 418, 421 (5th Cir. 2021)).

firing him. Instead, he simply contends that if BNSF had investigated his conduct further, it would have come to the conclusion that he did not violate any of BNSF's rules:

Q: **Do you believe that BNSF is lying when it says that it believes you were dishonest and engaged in misrepresentation**, or do you believe that BNSF is telling the truth about that but that they came to the wrong conclusion?

A: **I don't know what BNSF thinks**. I just know the end result is that I was dismissed.

Q: Okay. So, in other words -- Let me ask it maybe a slightly different way. Do you believe that BNSF fired you because you reported that June 18th injury?

A: Yes.

Q: And what is it that causes you to believe that that is the reason BNSF fired you?

A: We had an investigation 158 days after the injury, and the managers essentially laid out that they didn't believe that I had the injury at work when I said I had it.

Q: And **do you believe that they are – the managers you testified were lying when they said that**?

A: **No. I believe they were truthful about their intent**.

Q: And -- But then does that mean that you believe then they just -- **they were wrong about whether you were lying**?

A: **Yes, they were wrong**.

Q: And is the reason for that -- Well, just tell me in your words, why is it that you think they were wrong about that?

A: They never talked to my engineer. They never -- They never asked my engineer. He was standing beside me when the -- after the injury had happened. They never talked to him about -- made any efforts to talk to him. **They -- they didn't want to pursue it any further than they -- than they had pursued it in the investigation, so they didn't seem like they were really interested in knowing the truth. They just know what they perceive as being the truth**.

…

Q: And so earlier today when we started down this line of questioning is I was asking you why you believed that BNSF had fired you for reporting this injury, and one reason you gave me was that they didn't pursue it any further. So by not pursuing it any further, is -- is this what you're referring to --

A: Yes.

Q: -- that maybe they didn't follow up on this amended exhibit?

A: Yes. They didn't talk to the engineer to verify the actual injury. They didn't talk with the doctor to ask him about the injury and when it happened. **Yeah. I mean, it seemed like they got the answer they wanted**.

…

Q: Is there anything else that you're referring to when you say they didn't want to pursue it further other than not following up on the second note you presented, not talking to the engineer or the limo driver and not talking to your doctors?

A: As far as I know, that's the only thing. I mean, you know, I'm -- **I was essentially a victim of circumstance in that regard where it didn't seem like they pursued it. They got the answer they wanted to my estimation. Then they just stopped**. They didn't -- they already had -- It's been my estimation working for the railroad for over years that the managers that work underneath the general manager, once the general manager tells them something, that's it. They don't essentially contradict them, and I don't know for a fact. I just know this is the end result. The end result was I was dismissed for reporting an injury, **and they don't believe I had the injury that I had**.

Q: They --

A: And that's why they didn't charge us.

Q: You've used the phrase a couple times they got the answer they wanted. What is it you're referring to? **What was the answer they wanted in your view?**

A: **That the injury happened three weeks earlier**, and it didn't happen on the day -- the day that it happened.

…

Q: And then we had started our last long line of questioning with me asking you why you believed your injury was the real reason BNSF fired you, and we've talked a lot about the fact that you think BNSF could have done more investigating. But they stopped when they got the answer they wanted which is that it would be nonreportable [to the FRA], correct?

A: Yes. When I saw the e-mail instructions on the investigation from the Texas division manager to his managers saying to not include it as a reportable injury, that told me. That was 158 days before the investigation was that they've already instructed their managers not to include that injury on their -- on their list of reportable FRA injuries.

And if you look back and you look for that month, June of 2021, I'll bet you my injury is not included on there which tells me they didn't want -- they didn't include it and -- before they even asked my -- They never even talked to my engineer. **So, you know, they -- they just assumed the information they had was accurate, and they went from there**.

Now -- Now, you keep on using the word "they got the answer they wanted, they stopped." I don't know what they were thinking. I'm not a manager. I wasn't the manager at the time. All I know is who was inputting on the paperwork that I saw on the investigation that said 158 days prior to – I mean, approximately 158 days prior to the investigation, they made the decision, that's the division manager made the decision, not to include it on the reportable injuries.

Q: **And is there anything other than what you've just described that makes you believe that your injury report was the real reason BNSF fired you**?

A: **That's all I can surmise from what happened and the end result**.

…

Q: . . . When BNSF says that they came to the conclusion that you violated Rule 1.2.5, **do you believe that they are lying about that, or do you believe that they came to the wrong conclusion and that they would have come to the correct conclusion if they had considered additional information from your doctor and Mr. Caffey and others**?

A: **Yes. If they had -- If they had talked to my engineer, if they had realized that the information they had got on the MRI was incorrect, then it would have been a different outcome** as far as -- as far as I understand it.

…

Q: And on [Rule 1.2.7] similar to the one we just spoke about, is it your position that if BNSF had gotten additional information from your doctor or from Mr. Caffey or from others, they might have come to a different conclusion about whether you violated that rule?

A: **I am 100 percent certain that if the MRI information that they received had the correct information, we would not be having this conversation right now.**[24]

…

Q: The question that got us there is a question about this Rule 1.2.7 and whether you believe BNSF is lying when it says that it thinks you did not furnish information or if it's just that BNSF came to the wrong conclusion and that if it had investigated further, it would have come to a different conclusion. **If I understand you correctly, you're saying it was the latter, that BNSF could and should have investigated more. And if they had, it would have come to a different conclusion. Am I understanding your position correctly**?

A: **Yeah. If they would have -- If they would have understood that the date was wrong, we wouldn't be having this conversation today**.

App. 4-5, 11.1, 12-14, 24-26, 106-08, 109 (emphasis added); *see also* App. 168-70 (contending that a "mistake was made by the railroad interpreting some issues," namely BNSF's not interviewing the coworker who was with him on the 18th and coming to the conclusion that Martinez's injury was not work-related).

Martinez's position that BNSF came to an incorrect, but honest, belief that he violated its rules precludes him from prevailing on his FRSA claim. That follows from the consistent treatment

[24] Martinez's reference to an "incorrect" MRI relates to the fact the first doctor's note BNSF received from June 21 (*i.e.*, the date of the MRI) stated that Martinez had been experiencing "Left knee pain for three <u>weeks</u> with difficulty putting any weight on the knee," and he later submitted an amended note which said that pain had only been present for three <u>days</u>. App. 5-10, 111-12, 119-21, 122-24. That difference was irrelevant, however, given the fact that his medical records before June 18 reflected ongoing knee issues that had been present for months. *See, e.g.*, App. 113-15, 129-32.

in the Fifth Circuit of similar arguments under various discrimination cases.[25] It also is buttressed by the recent Supreme Court decision in *Murray*. Again, an FRSA plaintiff must show that the employer "intentionally treat[ed] [the employee] worse because of a protected characteristic."[26] Acting on the basis of what the employee contends is a mistaken view of the facts is necessarily not acting because of a protected characteristic.[27]

---

[25] *See, e.g., Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones."); *Dismuke v. City of Indianola*, 32 Fed. Appx. 126, at *3 (5th Cir. Feb. 11, 2002) (noting that "even where an employer objectively errs in concluding that an employee violated a work rule or policy, absent evidence of discriminatory motive for the employer's discipline of the employee, such error alone is insufficient to establish that the employer's proffered justification is pretext."); *Deines v. Texas Dep't of Protective & Regul. Servs.*, 164 F.3d 277, 281 (5th Cir. 1999) ("Whether the employer's decision was the correct one, or the fair one, or the best one is not a question within the jury's province to decide. The single issue for the trier of fact is whether the employer's [challenged decision] was motivated by discrimination."); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."); *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1165 (5th Cir. 1993) (holding that whether allegations that plaintiff had sexually harassed a coworker were actually true was irrelevant to whether employer believed in good faith that the accusations were true and thus discharged the plaintiff based on a legitimate, nondiscriminatory reason); *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 816 (5th Cir. 1993) ("The fact that the employers' reasonable belief eventually proves to have been incorrect. . . would not change the conclusion that the firing had been non-discriminatory"); *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason."); *De Anda v. St. Joseph's Hosp.*, 671 F.2d 850, 854, n.6 (5th Cir. 1982) ("Whether [Defendant] was wrong in its determination . . . is irrelevant, as long as its belief, though erroneous, was the basis for the termination.").

[26] *Murray*, 2024 WL 478566 at *6.

[27] *See, e.g.*, *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (1977), *overruled on other grounds, Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ("A review of the record makes clear that TI supervisors and personnel employees truly believed that Turner knowingly violated the time-card policy. Even if TI wrongly believed that Turner knowingly violated this policy, if TI acted on this belief it was not guilty of racial discrimination."); *see also Bryant*, 413 F.3d at 478; *Deines*, 164 F.3d at 281; *Mayberry*, 55 F.3d at 1091. In any event, the thing Martinez has repeatedly said BNSF should have done to further investigate the charges against him is to talk to the coworker who was there on the 18th about what happened that day. App. 11, 12, 116-17. But even if BNSF had done so, it would not have had any bearing on the allegations of misconduct, because Martinez agrees that his coworker has no knowledge of what he was experiencing before the 18th. *Id*. Moreover, Martinez had the ability to present the

Nor is this a case where BNSF's stated reason for firing Martinez is so obviously false that it is unworthy of credence.[28] To the contrary, as noted above, Martinez's primary argument at the on-site investigation and in this litigation has been that his medical records do not accurately reflect what he was experiencing at the time. *See, e.g.*, App. 87.[29] But, importantly, he agrees that what is reflected in those records show things that he would have been obligated to report under BNSF's rules:

> Q: Do you -- And I understand that you say this is not what happened. **Do you agree that if an employee twists their knee at work and cannot put weight on their knee after twisting their knee, that's something that BNSF's rules require them to report as soon as it happens?** Do you agree with that?
>
> A: **Sure.**
>
> …
>
> Q: In other words, if you're -- **if you were experiencing an issue where your knee was buckling, you would agree that's something that could affect your ability to do your job at BNSF?**
>
> A: **Yeah.**
>
> …
>
> Q: Mr. Martinez, **do you agree that not being able to put weight on one's knee is something that could affect a person's ability to do their job as a conductor at BNSF?**

---

coworker as a witness at the hearing if he had wanted to do so, and instead opted only to present a written statement from that coworker. App. 91-92; 310-12, 320-21.

[28] *See generally Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (explaining that a "plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.") (internal quotation omitted).

[29] It is unclear whether he will continue to press this argument given his admission that he told the truth to his doctors, and that if one wanted to know more about what he was experiencing during the period his doctors were were treating him, they could look at what he said to those doctors. App. 28-29, 45-47.

A: **Yep. Sure.**

Q: **Do you agree that having your leg lock up is something that can affect a person's ability to do their job as a conductor at BNSF?**

A: **If that was happening, yes.**

Q: **Do you also agree that if -- that occasions where a leg intermittently buckles is something that could affect a person's ability to do their job as a conductor at BNSF?**

A: **Yes.**

Q: And during your employment, were you aware that BNSF had rules that required employees to report off-duty conditions or injuries that could affect their ability to do their job as a conductor?

A: Yes.

Q: **And if any of those things had occurred to you prior to June 18th, do you agree that you had an obligation to report them to BNSF under their rules?**

A: **If they had occurred, yes.**

App. 53, 55, 61-62 (emphasis added); *see also* App. 146-47 (Martinez acknowledging that if his knee locked up while working and he fell because he could not put weight on it, an injury could result). These admissions foreclose any argument that BNSF's reason for firing Martinez is unworthy of credence.

Nor does Martinez have other evidence that BNSF fired him because he reported an injury, as opposed to the reason it set out when it fired him (*i.e.*, that it believed he had violated BNSF's rules). For example he agrees that no one at BNSF ever tried to talk him out of reporting the June 18 injury. App. 74-75. He likewise agrees that no one at BNSF ever said anything negative about his injury report, his decision to get medical treatment, or his need for medical leave. App. 75, 88. Indeed, setting aside the fact that BNSF fired him, Martinez takes no issue with how BNSF handled his need to get medical treatment and take medical leave following the incident on the 18th. App.

89.[30]

Martinez likewise cannot point to <u>prior</u> instances where he was discouraged from, or retaliated against for, taking medical leaves or engaging in other FRSA-protected activity. For example, Martinez previously went one medical leave to deal with a hernia, and another that he believes related to a cardiac incident. App. 32-35, 126. He does not allege that BNSF retaliated against him for taking either of those leaves. *Id*. Martinez also testified that, during his employment, he reported safety issues "whenever [he] saw them" and that BNSF never retaliated against him for doing so. App. 35-36.

In short, none of the traditional ways that employees often attempt to prove causation are present in this case. Based on other actions and positions Martinez has taken during this litigation, it appears he may attempt to demonstrate a genuine issue of material fact regarding causation through less common means. BNSF addresses those alternative means below. None have merit.

3. <u>Martinez's argument that he complied with GCOR 1.2.5 as it was written is not evidence of causation</u>.

Martinez may argue that his knee injury was not reportable under GCOR 1.2.5 because he

[30] Martinez may argue that alleged comments from years ago by two persons who were not involved in his firing support his claim. *See* App. 15-18, 19-23 (describing one situation approximately 15 years earlier where a manager requested that Martinez obtain medical eyedrop samples rather than an eyedrop prescription following an incident with his eye because the former would not count as a "reportable injury," and another 2 to 5 years earlier where a manager commented that an employee who received treatment after smelling what he thought was hazardous materials but ended up being a carload of "stinky cheese" did not actually need to see a doctor in that circumstance). Under well-established Fifth Circuit precedent, these comments (if they occurred) are nothing more than stray remarks that do not constitute evidence of discrimination. *See, e.g., Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 380–81 (5th Cir. 2010) ("[C]omments are evidence of discrimination only if they are 1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue. Comments that do not meet these criteria are considered stray remarks, and standing alone, are insufficient to defeat summary judgment.") (internal quotations and citation omitted).

came to work with the injury for a few weeks and did not further injure himself until the 18th (*i.e.*, that a lack of a further injury before the 18th necessarily means that his injury did not "affect employee performance" as contemplated by GCOR 1.2.5). Any such argument would not demonstrate causation for several reasons.

First, the argument assumes that Martinez's pre-June 18 meniscal tear was not getting larger each day he came to work. Martinez has no evidence for such a premise.

Second, even if Martinez could establish that his meniscal tear did not get larger between June 10 (*i.e.*, the date his doctor assessed him as having a "[t]ear of medial meniscus of left knee") and June 18, BNSF has presented uncontroverted corporate representative testimony of its position that that the injury Martinez experienced before the 18th was reportable under BNSF's rules because an inability to bear weight on a knee and intermittent buckling of a knee precluded him from consistently and safely performing the duties of a conductor. App. 413-19. Martinez's conclusory reasoning to the contrary (*i.e.*, that it was safe for him to work with a torn meniscus up until June 18 simply because the tear did not physically stop him from working before that date) is akin to someone playing Russian Roulette, getting a blank chamber, and then claiming that because the gun did not discharge, it is safe to play Russian Roulette. Although Martinez may claim to subjectively interpret BNSF's rules in this matter, BNSF was not required to wait until Martinez hurt himself before taking action,[31] and it is improper for Martinez to ask the Court to

[31] *See generally Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) (noting that a diabetic episode while working with heavy machinery rendered plaintiff a "walking time bomb and woe unto the employer who places an employee in that position"); *Kirkish v. Mesa Imports, Inc.*, No. CV-08-1965-PHX-NVW, 2010 WL 364183, at *6 (D. Ariz. Feb. 1, 2010) ("Common sense suggests that an employer should not have to wait for an accident to occur to justify taking preventative steps."), *aff'd*, 442 F. App'x 260 (9th Cir. 2011).

second-guess its decisions as a way to demonstrate causation.[32]

Third, under Fifth Circuit precedent, an employee cannot prove causation simply by claiming that he did not violate the rules at issue.[33] Should Martinez make such an argument, the Court should reject it.

Fourth, and finally, this argument would address only one of the three rules Martinez was dismissed for violating. Because an "employee seeking to show pretext must rebut each discrete reason proffered by the employer,"[34] the argument (if accepted by the Court) still would not warrant a denial of summary judgment.

4. Martinez's argument that he complied with GCOR 1.2.5 as he interpreted it, and arguments about the rule's fairness, are not evidence of causation.

Martinez may argue that summary judgment is inappropriate because he truly believed he was complying with GCOR 1.2.5 as he understood it, and that the rule as BNSF actually enforces it is unfair.[35] Regarding his alleged understanding of the rule, throughout this dispute, Martinez has said that he thought the off-duty-injury reporting rule only required him to report injuries that

[32] *Jackson v. Watkins*, 619 F.3d 463, 468 (5th Cir. 2010) ("[I]t is not our place to second-guess the business decisions of an employer, so long as those decisions are not the result of discrimination."); *Deines v. Texas Dep't of Protective & Regul. Servs.*, 164 F.3d 277, 281 (5th Cir. 1999) ("We have previously emphasized that discrimination laws are not vehicles for judicial second-guessing of business decisions.") (internal quotations and alterations omitted); *Dubaz v. Johnson Controls World Servs., Inc.*, 163 F.3d 1357 (5th Cir. 1998) (explaining that courts are not permitted "to sit as a super-personnel department and micromanage a company's business decisions").

[33] *See, e.g., Cervantez v. KMGP Servs. Co. Inc.*, 349 F. App'x 4, 10 (5th Cir. 2009) ("[W]e emphasize. . . that a fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith"); *Moyer v. Jos. A. Bank Clothiers, Inc.*, No. 3:11-CV-3076-L, 2013 WL 4434901, at *8 (N.D. Tex. Aug. 19, 2013) ("[Plaintiff's] arguments that her conduct did not violate [Defendant's] policies are insufficient to raise a genuine dispute of material fact as to pretext").

[34] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015).

[35] In addition to this argument being without merit for the reasons discussed in this paragraph, it would not address the other two rule violations, each of which he is required rebut under applicable law. *Burton*, 798 F.3d at 233.

resulted in work restrictions from his personal doctors. App. 64-65. But that interpretation of the rule is objectively wrong, because the rule does not make an employee's reporting obligation contingent on what their doctor believes is appropriate, as Martinez himself acknowledged.

> Q: . . . My question is, do you see anything in Rule 1.2.5 that says you only have to report an off-duty incident if you get a note from your doctor? Do you see anything about that?
>
> A: No.

App. 104; *see also* App. 200; 263-64; 338; 295-96. Moreover, Martinez's June 3 doctor's notes in fact list his "functional activity" of "working" as having a "moderate limitation," which contradicts his allegation of having no restrictions from his doctors. App. 177. In any event, despite Martinez's repeated explanation that he did not report his knee issues because his doctors allegedly did not issue a restriction, he also acknowledged knowing that he "[has] to report things if [he] can't do [his] job because of [his] physical condition." App. 173-74.

Regarding the alleged fairness of the rule, the requirement that employees report injuries that will affect their ability to work, regardless of what their personal doctor says, makes sense, because BNSF's medical team has expertise about railroad work and the physical demands it places on railroad workers that other doctors may lack. App. 263-64. Martinez does not allege that his personal doctors have expertise in railroad work beyond what "the average layman would probably have." App. 163-64, 165-67.[36] And Martinez did not educate them about even the basic requirements of his position by providing a written description of his duties. *Id.* Indeed, he does not remember telling them <u>anything</u> about his work beyond that he was a conductor and walked on uneven surfaces and carried bags as part of his job. *Id.* As a result, Martinez agrees that he

[36] Indeed, one of the doctors, Dr. Pham, seemed to know even less than that, because he recorded that Martinez worked in construction. App. 177.

cannot say what those doctors would have said with respect to potential restrictions if they knew more about what Martinez actually did for BNSF. *Id*.

In any event, these arguments, if Martinez makes them, are nothing more than an argument that he tried his best to comply with BNSF rules, and that it was unfair for BNSF to discipline him despite his best efforts. But that is a nonstarter given the clear caselaw in this Circuit that employers need only make nondiscriminatory decisions, as opposed to "fair" decisions.[37] Allegedly acting unfairly is not "intentionally treat[ing] [the employee] worse because of a protected characteristic."[38]

5. Martinez's arguments that he should have been trained on the reporting rule or that it contains ambiguities are not evidence of causation.

Relatedly, Martinez may argue that he was not sufficiently trained on BNSF's reporting rule, and that GCOR 1.2.5 is ambiguous under certain circumstances. For example, he may attempt to argue that there is a grey area between a simple ache or pain that need not be reported on the one hand, and injuries that must be reported on the other, and that he did not know he had crossed from the "not reportable" to "reportable" part of that spectrum. Any such arguments are both unsupported by the record and irrelevant for purposes of this Motion.

With respect to a training-based argument, BNSF does routinely train employees about its reporting rules, including by answering questions they have about specific circumstances. App. 420-25. If Martinez was confused about whether he was required to disclose information about his knee injury before the 18th, or to put information about that injury on the injury report he filled

[37] *See, e.g., Deines*, 164 F.3d at 281 ("Whether the employer's decision was the correct one, or the fair one, or the best one is not a question within the jury's province to decide. The single issue for the trier of fact is whether the employer's [challenged decision] was motivated by discrimination."); *see also* App. 236-37 (hearing officer Grissum testifying that the reporting rules in question do not turn on an employee's subjective intent).

[38] *Murray*, 2024 WL 478566 at *6.

out on the 21st, he could have asked Hammond or another supervisor about the issue. *See generally,* App. 426-28. He did not do so, perhaps because he "used to be a local chairman" and therefore "underst[oo]d the rules." App. 162.

With respect to a grey-area argument, the witnesses involved in Martinez's dismissal testified that they believed the specific symptoms reflected in Martinez's June 10 doctor's note clearly fell on the "reportable to BNSF" side of the spectrum. App. 295-96; 242-47; 334.[39] Martinez has no evidence that they are lying, and in fact, as explained above, has agreed that they are telling the truth about that determination. App. 4-5, 11.1, 12-14, 24-26, 106-08, 109. Moreover, given Martinez' own medical records, this is not a close case. Whatever ambiguity Martinez may allege in cases involving other employees with other physical conditions, the records show that he plainly was receiving treatment for a knee injury that he did not report to BNSF.

In any event, each of these arguments would simply be yet another way of claiming that it was unfair for BNSF to interpret its rules as it did and hold Martinez liable for violating them. But the Fifth Circuit does not permit employees to prove discrimination in this manner.[40]

6. The fact that Martinez eventually signed a medical release does not excuse his misconduct.

Martinez may argue that he in fact did comply with BNSF's reporting rules because he eventually signed a medical release that allowed BNSF to get his medical records. As a threshold issue, BNSF notes that Martinez signed the release on June 30 (*i.e.*, 12 days after the incident on the 18th and months after the symptoms reflected in his medical records first surfaced) and that he

[39] Hennessey, who was not involved in the dismissal decision, testified similarly. App. 380-85.

[40] *See, e.g., Deines*, 164 F.3d at 281 ("Whether the employer's decision was the correct one, or the fair one, or the best one is not a question within the jury's province to decide. The single issue for the trier of fact is whether the employer's [challenged decision] was motivated by discrimination.").

did not actually provide the release to BNSF until July 8, over a week later. App. 86, 134; 210; 451-52. This argument therefore fails as a factual matter, because BNSF's injury reporting rule (*i.e.*, GCOR 1.2.5) requires employees to report on-duty injuries "immediately" and off-duty injuries that affect the employee's performance "as soon as possible." App. 200.[41] More importantly, this would be nothing more than an argument that BNSF reached the wrong conclusion about Martinez's compliance with the rules, something that does not establish causation for the reasons set out above.

7. <u>BNSF's decision to charge Martinez with a more serious rule violation than a less serious one does not establish causation.</u>

Martinez may argue that he can establish discrimination by noting that BNSF could have charged him with a less-serious rule violation, and that there is a fact issue as to whether BNSF decided to charge him with the more serious rule due to discriminatory reasons. But the person who made that decision, Hammond, explained why he did so. App. 354-60. Specifically, he believed that Martinez knew he had something "seriously wrong with his knee," yet choose to jeopardize himself by not reporting that fact and coming to work anyway. *Id.* Martinez has nothing beyond his own speculation (which is not evidence) to contradict that testimony.

8. <u>The fact that BNSF learned about Martinez's misconduct in connection with his injury report is not evidence of causation.</u>

Martinez may argue that he can establish the contributing factor element by showing that BNSF would not have learned about his misconduct (*i.e.*, his failure to report his knee injury and ongoing knee issues) if he had not reported an injury on the 18th. In other words, he might claim that he is somehow immunized from discipline for his misconduct because a protected report is

[41] The same would be true if Martinez attempted to argue that he complied with BNSF's rules through the conversations he had with BNSF's Claims Department after June 21.

what revealed his misconduct. But any such argument is squarely foreclosed by Fifth Circuit precedent.

Specifically, in *Yowell v. Administrative Review Board*,[42] a case with striking similarities to this one, the Fifth Circuit considered an employer's decision to fire an employee who violated its injury-reporting rule. That employee initially reported that he injured his knee while working.[43] While investigating what happed, the employer eventually learned that the employee had in fact "injured his knee sometime the prior week but had failed to report it."[44] Because the employee's failure to immediately report the knee injury violated the employer's reporting rule, it fired him. The employee then sued under the FRSA and argued (among other things), that he had proven causation because the employer only learned about his misconduct because he engaged in protected activity.[45]

In analyzing that argument, the Fifth Circuit "summarized a substantial amount of the caselaw on the contributing-factor standard"[46] and then conclusively rejected the employee's argument:

> Under the FRSA, when an employee engages in a protected activity such as reporting a workplace injury, that employee is not insulated from what would otherwise be appropriate discipline for misconduct that becomes known to the employer at that time or during the course of the employer's addressing the

[42] 993 F.3d 418 (5th Cir. 2021).

[43] *Id*. at 420.

[44] *Id*.

[45] *Id*. at 427 ("Yowell agrees that all he has, though of course he argues that all he needs, is that [his employer] learned of his failure to comply with his obligation to report timely all injuries when he made his delayed report, thereby making the protected activity of reporting an injury a contributing factor in his employment termination. There is nothing further, such as evidence that company representatives attempted to prevent his report or discouraged him from reporting.").

[46] *Id.* at 422-27.

> protected activity. In simple terms, a protected activity does not by itself shield an employee from the ramifications of workplace misconduct.[47]

Accordingly, the Fifth Circuit explained that "an employee may not rely solely on the fact that a protected activity is what informed the employer of wrongdoing," and that "[i]nstead, the focus must be on the employer's actions after learning of wrongdoing."[48] And, because the undisputed evidence demonstrated that "it was not the fact of reporting an injury but the failure to report promptly an earlier injury that caused [the employee] to be discharged," the Fifth Circuit concluded that the employer permissibly "[ended the employee's] employment for his failure to report his work injury promptly."[49] Other Circuits have similarly held.[50] The Court likewise should reject any attempt by Martinez to prove causation by arguing that his misconduct would have gone undiscovered if he had not reported an injury.

---

[47] *Id*. at 427.

[48] *Id*.

[49] *Id*. at 428.

[50] *See, e.g. Dakota, Minnesota & E. R.R. Corp. v. U.S. Dep't of Lab. Admin. Rev. Bd.*, 948 F.3d 940, 946 (8th Cir. 2020) (rejecting the notion that an "employee can be free of discipline and recover FRSA damages simply by disclosing misconduct of which the employer is otherwise unaware in a report that will be considered protected FRSA activity", and holding that a "suspension imposed for violating [a prompt-reporting] rule does not, without more, evidence discrimination against a good faith rail safety whistleblower"); *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 875 (7th Cir. 2016) ("And that the theft had been discovered in the course of an investigation triggered by the injury report obviously did not prevent the railroad from concluding that he had stolen the ties."); *see also generally Plumlee v. City of Kennedale*, 795 F. Supp. 2d 556, 564 (N.D. Tex. 2011) ("Plaintiff is not immune from adverse action for misconduct merely because defendant learned of the misconduct during its investigation of plaintiff's race-discrimination complaint."); *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 353, 115 S. Ct. 879, 882, 130 L. Ed. 2d 852 (1995) ("Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, it cannot be required to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if it might have gone undiscovered absent the suit.").

9. <u>BNSF's determination that the incident on the 18th was not reportable to the FRA is not evidence of causation.</u>

Martinez may argue that he can establish causation by establishing that BNSF should, but did not, report the incident on June 18 to the Federal Railroad Administration ("FRA"). Any such argument should fail.

As background, the FRA oversees a detailed statutory and regulatory framework that includes a requirement that railroads report (among other things) certain injuries experienced by its employees. *See* 49 U.S.C. § 20901; 49 C.F.R. § 225.1 *et seq*. BNSF's former Director of Safety, Ron Hennessey, made the determination that what happened to Martinez on June 18 was not reportable under the FRA's requirements, and explained his reasoning for that decision. App. 366, 367-69, 371-72, 373-79.[51] Following Hennessey's retirement, Senior Manager of Safety Reporting, Robert Raglin, testified as a corporate representative about the Company's position that Hennessey's determination was correct under applicable law. App. 392-92.1, 392.2-394.5.

Martinez has retained an alleged expert to testify that BNSF made a legally incorrect determination as to the FRA reportability question. Martinez's approach and the attempt to use that claimed expert are all distractions, with no bearing on the issues in this discrimination case. BNSF is filing a contemporaneous motion to exclude that testimony due to its irrelevance and lack of reliability. But even if the Court were to consider it, that testimony has no bearing on any issue presented in this Motion. Hennessey (the FRA reportability decisionmaker) had no involvement in the decision to investigate or discipline Martinez, and Thompson (the discipline decisionmaker) had no involvement in the decision about whether to report the June 18 incident to the FRA. App. 370; 284, 301. Any attempt to argue that a decision made by Hennessey about technical FRA-

[51] Martinez acknowledges that he knows of no reason why Hennessey would lie about Martinez. App. 27.

reporting issues has any bearing on an unrelated decision made by Thompson about whether Martinez violated BNSF's rules, much less that it is evidence that Thompson (or anyone else involved in Martinez's dismissal) acted because of Martinez's injury report, plainly is without merit.

# # #

In short, none of the arguments that Martinez has made or might make in this case suffices to establish the causation element of his initial case. BNSF therefore is entitled to summary judgment on Martinez's FRSA claim.

10. BNSF has established its affirmative defense.

Alternatively, BNSF is entitled to summary judgment because there is no material issue of genuine fact as to its affirmative defense. Importantly, the defense does not require "that the adverse personnel action be based on facts completely separate and distinct from protected whistleblowing disclosures."[52] Instead, the "right way to think about [the] same-action causation analysis is to change one thing at a time and see if the outcome changes."[53] As the Supreme Court has explained, when an employer has fired an employee for a reason other than the employee's protected activity, "it will have no trouble" establishing its affirmative defense.[54]

Under the facts of this case, the Supreme Court's guidance in *Murray* counsels that the Court should consider whether BNSF has established by clear and convincing evidence that it would have fired Martinez if it had learned about his misconduct (*i.e.*, his failure to timely and

---

[52] *Muray*, 2024 WL 478566 at *8 (internal quotation and citation omitted).

[53] *Id*. (internal quotation and citation omitted).

[54] *Murray*, 601 U.S. at 39.

truthfully disclose his knee injury as required by BNSF's rules) through some means other than his protected injury report on June 21.[55] BNSF has done so.

Specifically, Thompson (the decisionmaker) unambiguously testified that he would have made the exact same decision if he had learned of Martinez's misconduct through some means other than his injury report:

> Q: If he hadn't been injured on the 18th, and BNSF had learned of his -- seeing his doctor through some other channel, would you have still supported dismissal?
>
> A: Based on – that's a very broad -- I mean, so let me ask you -- I guess I'm misunderstanding your question, so could you ask that to me again?
>
> Q: Sure. So **if everything was the same about Mr. Martinez seeing his doctor, maybe experiencing some stiffness and underlying things he was seeing his doctor for and he didn't notify BNSF of that, if BNSF learned of his failure to disclose that not through his injury report on the 18th, would you still have supported his violation of GCOR for just that**?
>
> A: Yeah, if he -- so if you're saying -- if you're saying would I still have held -- would we still have held him accountable for not reporting to BNSF if there had not been an injury, **yes, we would have still held him accountable for him not reporting his medical condition/situation to BNSF if we found out about it by some other means**.

App. 299-300 (emphasis added, objection omitted). He further testified that BNSF had done precisely that in other instances:

> Q: **Are you aware of other employees that have been disciplined for failing to furnish information where there wasn't also an injury report involved**?
>
> A: **Yes.** There has been some cases over time where people have had different things going on that were not involved with an injury. I don't remember

[55] *See generally id.* (discussing a prior case where an employer learned of an employee's misconduct, which included a violation of a prompt-reporting rule, through the employee's protected activity, and noting that "the correct inquiry [in that prior case] was whether the employer would have taken the same action if it had learned of the contents of the employee's protected disclosure through other means.").

> them. They have been -- **there were not too many of them that I recall, but there have been some**.

App. 300 (emphasis added). This testimony, which has not been rebutted, is conclusive evidence establishing BNSF's affirmative defense.

And it is not the only such evidence. In *Epple v. BNSF Ry. Co.*,[56] the Fifth Circuit found the defense was established where BNSF (1) thoroughly investigated the plaintiff's rule violation, (2) conducted a formal investigation for a rules violation where the plaintiff presented evidence and called witnesses, and (3) had a disinterested manager review the transcript of the formal investigation to make the decision whether to assess discipline.[57] Notably, the Fifth Circuit reached that ruling in affirming a bench trial decision for BNSF but on grounds other than those addressed by the district court.[58] In other words, the Fifth Circuit held that the record evidence of the above circumstances established the defense as a matter of law, the same standard applicable to BNSF now seeking summary judgment in its favor on the defense.

The Fifth Circuit explained that "it is easy to see" why those procedures are given "so much weight," namely that "[a] company signals its concern when it is willing to expend [time, money, and resources] to uncover the truth about an employee's conduct," and that the procedures "also have the added benefit of diluting the influence of any individual with an improper motive."[59] The Fifth Circuit further explained that where the employee had previously engaged in protected activity without issue, the company demonstrated a "history of compliance" that, while not

[56] 785 F. Appx 219 (5th Cir. 2019).

[57] *Id*. at 223.

[58] *Id*. at 222-24.

[59] *Id*. (further explaining that "[t]he more layers of review and the more personnel involved makes it less likely for bad actors to steer the process toward an outcome the company would not have otherwise chosen.").

precluding possibility of discrimination, "does imply that the circumstances surrounding [the incident at issue]" were not discriminatory.[60]

All of these factors are present here. As discussed above, BNSF thoroughly investigated Martinez's misconduct. As part of that investigation, Martinez and his union representative attended a hearing where they were allowed to present evidence and witnesses. App. 91-93. A disinterested conducting officer and a member of the Labor Relations Department independently reviewed the facts and made dismissal recommendations. App. 227-33, 234-35, 238-40, 241, 242-47; 307; 324-26, 329-33, 335, 336-37, 342. The decisionmaker, who had no prior experience with Martinez, made a decision based on his review of the facts. App. 282-83, 285-86, 290-93, 294-95, 302-03, 307. And Martinez had previously engaged in protected activity without experiencing retaliation. App. 32-36. Given these facts, and the absence of controverting evidence by Martinez, BNSF is entitled to summary judgment on the alternative ground that it established its affirmative defense.

**B. Summary Judgment is Appropriate on Martinez's ADA Claim.**

1. Applicable Standards

The ADA allows an employer to inquire into an employee's ability to perform job-related functions, 42 U.S.C. § 12112(d)(4)(B), and to seek medical information and require medical examinations when doing so is job-related and consistent with business necessity, *id.* § 12112(d)(4)(A). Accordingly, "[t]he statute is clear that an employer is permitted to ask some

[60] *Id*. at 223-224; *see also Brousil v. United States Dep't of Lab., Admin. Rev. Bd.*, 43 F.4th 808, 812 (7th Cir. 2022) (upholding affirmative-defense finding where employer based challenged action on unprotected misconduct); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792-93 (8th Cir. 2014) (determining that BNSF satisfied the affirmative defense because, among other things, BNSF (a) investigated the alleged misconduct; (b) conducted a formal hearing; and (c) referred the evidence from the hearing to a disinterested manager to make the decision).

disability-related questions."[61] As the Fifth Circuit has explained, such inquiries are permitted where the employer has "a reasonable concern about the employee's ability to perform essential job functions or that the employee will pose a direct threat because of a medical condition."[62]

Allowing an employer to make these inquiries provides an important function, because the safety of employees, coworkers, and the general public is an important aspect of any job and "is a paradigmatic necessity of operating a business."[63] That is particularly true of the railroad industry. The United States Supreme Court has recognized that railroading is "an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees."[64] The Supreme Court has further recognized that "persons engaged in handling orders concerning train movements, operating crews, and those engaged in the maintenance and repair of signal systems" must "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences."[65] And, due

---

[61] *Diggs v. Burlington N. & Santa Fe Ry. Co.*, 742 F. App'x 1, 3 (5th Cir. 2018).

[62] *Id.*; *see also Hinojosa v. Jostens Inc.*, 128 F. App'x 364, 368 (5th Cir. 2005) ("[T]he ADA authorizes employers to inquire about an employee's ability to perform job-related functions"); *Fuzy v. S&B Engineers & Constructors, Ltd.*, 332 F.3d 301, 303 (5th Cir. 2003) ("Under § 12112(d)(4)(A) and (B), an employer may inquire and make medical examinations if they are shown to be job-related and consistent with business necessity.").

[63] *U.S. v. E.E.O.C. v. AIC Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir. 1995); *see also Painter v. Ill. Dep't of Transp.*, 715 F. App'x 538, 541 (7th Cir. 2017) ("Preventing employees from endangering their coworkers is a business necessity…Employers need not retain workers who, because of a disability, might harm someone; such a rule would force an employer to risk a negligence suit to avoid violating the ADA."); *accord Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *Conroy v. New York Dept. of Correctional Servs*., 333 F.3d 88, 97 (2d Cir. 2003).

[64] *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 627 (1989); *see also Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment, Cent. Conference v. Union Pacific R. Co.*, 719 F.3d 801, 804 (7th Cir. 2013) (Railroad "employees who are not sufficiently healthy, alert, and fit for work can pose grave dangers to themselves and to many others.").

[65] *Skinner*, 489 U.S. at 620, 628.

to the nature of those duties, the Supreme Court has compared such workers to employees in nuclear power plants: "Much like persons who have routine access to dangerous nuclear power facilities, employees who are subject to testing under the FRA regulations [a category that includes train-service employees[66]] can cause great human loss before any signs of impairment become noticeable to supervisors or others."[67] Martinez's attempt to restrict BNSF's ability to learn about an employee's injuries that affect their ability to work safely directly conflicts with the important goal of ensuring the safety of railroad employees and members of the public.

2. BNSF's inquiries were permitted by the ADA.

As stated above, BNSF fired Martinez for being dishonest and not disclosing certain information about his knee injury on a timely basis. When BNSF deposed Martinez, it asked him about the basis of his ADA claim. App. 147-54. Martinez said that any questions about that claim should be directed to his lawyer, and his lawyer then made objections effectively prohibiting Martinez from answering follow-up questions. *Id.* And, though Martinez's counsel said he had no objection to Martinez answering factual questions about his claim, Martinez failed to do so. App. 151-54. Accordingly, the basis of Martinez's ADA claim is murky at best.

Based on comments that Martinez's lawyer made during Martinez's deposition, however, it appears Martinez is alleging that BNSF's requirement that he disclose the issues he was experiencing with his knee before June 18 violated the ADA. App. 154-59. Any such allegation is wrong as a matter of law, because the ADA permitted BNSF to require those disclosures both before and after the incident on June 18.

---

[66] *See* 49 C.F.R. §§ 209.301, 209.303(a) (covering railroad employees subject to Hours of Service Act, which includes train-service employees, 49 U.S.C. §§ 21103, 21101(5)).

[67] *Skinner*, 489 U.S. at 628 (internal citations omitted).

With respect to the period before June 18, BNSF's rules required Martinez to disclose off-duty injuries that "will in any way affect employee performance of duties." App. 200. That requirement is permitted by 42 U.S.C. § 12112(d)(4)(B) because it does nothing more than ask employees to disclose conditions that will affect their job-related functions. Indeed, Martinez admits that the things reflected in his pre-June 18 medical records (*i.e.*, the records he now says BNSF was not permitted to request or base a dismissal decision on) were the sort of things that could directly affect his ability to work as a conductor at BNSF:

> Q: Mr. Martinez, **do you agree that not being able to put weight on one's knee is something that could affect a person's ability to do their job as a conductor at BNSF**?
>
> A: **Yep. Sure.**
>
> Q: **Do you agree that having your leg lock up is something that can affect a person's ability to do their job as a conductor at BNSF**?
>
> A: **If that was happening, yes.**
>
> Q: Do you also agree that if -- that **occasions where a leg intermittently buckles is something that could affect a person's ability to do their job as a conductor at BNSF**?
>
> A: **Yes.**
>
> . . .
>
> Q: . . . **Do you agree that an inability to put weight on a knee could affect your ability to do your job as a BNSF conductor**?
>
> A: **Sure.**

App. 61, 105 (emphasis added). As such, nothing in the ADA prohibited BNSF from (1) requiring Martinez to provide that information before June 18, or (2) firing him for failing to do so. Martinez's claim to the contrary is without merit.[68]

With respect to the period on and after June 18, BNSF was permitted to require Martinez to disclose information about his knee injury under 42 U.S.C. § 12112(d)(4)(B) for the same reason just discussed, as well as for three additional reasons. First, the request was permitted under 42 U.S.C. § 12112(d)(4)(A) because the request was job-related and consistent with business necessity, something the EEOC has said exists "when an employer has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition."[69] Here, there can be no dispute that, as of June 18, BNSF had objective evidence from

---

[68] In particular, Martinez's apparent belief that an employer need to wait for an employee to hurt himself before asking for medical information is wrong. *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010) ("[W]e hold that the business necessity standard may be met even before an employee's work performance declines if the employer is faced with significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job") (internal quotation and citation omitted); *Leonard v. Electro-Mech. Corp.*, 36 F. Supp. 3d 679, 687 (W.D. Va. 2014) ("Courts have rejected the notion that the business necessity standard cannot be met without showing that an employee's job performance has suffered as a result of the employee's health problems. . . . Likewise, courts have recognized that employers need not wait for an accident to occur before requiring an employee to undergo a medical examination."); *Kirkish v. Mesa Imports, Inc.*, No. CV-08-1965-PHX-NVW, 2010 WL 364183, at *6 (D. Ariz. Feb. 1, 2010) ("Common sense suggests that an employer should not have to wait for an accident to occur to justify taking preventative steps."), *aff'd*, 442 F. App'x 260 (9th Cir. 2011).

[69] U.S. Equal Employment Opportunity Commission, *Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the ADA*, https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#5 (hereinafter "ADA Guidance") (internal quotations and citations omitted); *see also Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 339 (4th Cir. 2022) ("The [job-related and consistent with business necessity] standard is met if the employer reasonably believes that an employee's medical condition impairs his ability to perform the essential functions of the job or the employee poses a direct threat to himself or others.") (internal quotations and citations omitted); *See v. Illinois Gaming Bd.*, 29 F.4th 363, 369 (7th Cir. 2022) ("In this context, a medical examination is job-related and consistent with business necessity when an employer has

Martinez himself that his medical condition impaired his ability to perform his essential job functions and that he would pose a direct threat to himself if he continued to work with that condition. That evidence entitled it to ask the questions and obtain the information at issue here.[70]

Second, Martinez took medical leave in connection with his injury. App. 87-88. As a result, BNSF was entitled to request information about the condition underlying the need for leave.[71]

Finally, the EEOC has recognized that "[t]he ADA does not prohibit an employer or its agent from asking disability-related questions or requiring medical examinations that are necessary to ascertain the extent of its workers' compensation liability."[72] Although BNSF is not subject to state workers' compensation laws,[73] its Claims Department functions in a similar way for a similar purpose. *See generally* App. 400-01. Thus, the rationale for allowing inquiries in the state workers' compensation context applies equally to the Claims function that railroads use as alternatives to a

---

a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition.") (internal quotations and citations omitted).

[70] *See, e.g., Mills v. Johnson*, No. 4:13-CV-352-A, 2014 WL 1224748, at *6 (N.D. Tex. Mar. 24, 2014) ("Once plaintiff told the [employer] that she was unable to perform an aspect of her job due to a medical condition, the [employer] was authorized to make inquiries into the her ability to do her job."); *Parker v. Pulte Homes of Texas, L.P.*, No. CIV.A. H-09-2743, 2011 WL 767182, at *9 (S.D. Tex. Feb. 25, 2011) ("The case law on inquiries directed towards individual employees thus demonstrates that courts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties.") (quoting *Conroy v. N.Y. Dep't of Correctional Servs.*, 333 F.3d 88, 98 (2d Cir. 2003)) (internal alteration omitted).

[71] *See generally* ADA Guidance at Question 15 ("An employer is entitled to know why an employee is requesting sick leave.").

[72] Enforcement Guidance: Workers' Compensation and the ADA, available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-workers-compensation-and-ada.

[73] *In re Jones*, 446 B.R. at 471.

formal workers' compensation system. BNSF was permitted to obtain the information at issue here for this additional reason.

In short, BNSF's requests for medical information in this case were not based on the sort of myths, fears, or stereotypes that the ADA was designed to overcome.[74] Instead, they were focused on Martinez's ability to perform the functions of his job and (after June 18) on objective information it received from Martinez himself. Accordingly, Martinez's improper-inquiry claim under the ADA fails as a matter of law.

## VII. CONCLUSION

BNSF fired Martinez for failing to truthfully, timely, and fully disclose information about his knee injury as he was required to do under several of BNSF's rules. That requirement was not arbitrary or capricious; it allows BNSF to ensure that employees (like Martinez) do not come to work with injuries (like Martinez's injured knee) that could cause them to be hurt while doing their jobs (like Martinez says happened on June 18). *See generally* App. 79 (Martinez testifying that "it makes sense" to think that he might be in a better position if he had remained off work from the time he saw the orthopedic specialist until the time of the MRI). Martinez's decision to disregard those rules meant he was placing his safety and his job at risk. Having made that unwise decision and experienced the consequences, Martinez cannot now attempt to shift the blame to BNSF. Put simply, his dismissal did not violate the FRSA or the ADA, and this dispute should not consume any more judicial or public resources. Accordingly, BNSF asks the Court to dismiss Martinez's claims with prejudice, order that he take nothing, and award BNSF its costs.

Dated: June 7, 2024.

[74] *See generally* 29 C.F.R. § Pt. 1630.2(l), App (discussing the fears, myths, or prejudice about disabilities that Congress sought to overcome by virtual of the ADA).

Respectfully submitted,

/s/ Micah R. Prude
Micah R. Prude
State Bar No. 24051216
Catherine Barbaree
State Bar No. 24098962

HOLLAND & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
E-mail: micah.prude@hklaw.com
E-mail: catherine.barbaree@hklaw.com

ATTORNEYS FOR DEFENDANT
BNSF RAILWAY COMPANY